UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DABIAN BOYD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:18-cv-00020-WTL-DLP |
| | ) |
| WARDEN, | ) |
| | ) |
| Respondent. | ) |

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORUPUS**

Petitioner Dabian Boyd was convicted of two counts of murder in an Indiana state court. Mr. Boyd now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues that both trial and appellate counsel provided ineffective assistance. The Indiana Court of Appeals concluded that, although his counsel's performance was deficient, Mr. Boyd was not prejudiced by their errors. Because the Indiana Court of Appeals reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in reaching this conclusion, Mr. Boyd is not entitled to habeas relief. Accordingly, Mr. Boyd's petition for a writ of habeas corpus is **denied** and a certificate of appealability will not issue.

# I.
# Background

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). On appeal from the denial of Mr. Boyd's state petition for post-conviction relief, the Indiana Court of Appeals summarized the facts and procedural history as follows:

On the night of May 5, 2012, a woman saw Kalyn Farmer staggering down a street

in South Bend. Farmer asked her for help, telling her that he had been shot. Farmer had been shot three times in the back, "with one bullet entering his lower back to the right and lodging into his spine, another traversing through his upper right arm and through his right forearm, and the third entering in the lower right portion of the back, and travelling through the abdominal cavity, liver, and right lung." *Boyd v. State*, No. 71A04-1304-CR-174, slip op. at 2 (Ind. Ct. App. Dec. 10, 2013) [("*Boyd I*")]. Farmer was taken to a hospital, where he later died from his injuries. The South Bend Police Department was notified of the shooting, but officers were unable to get a statement from Farmer before he died.

On the same night, Cheryl Holt, who is Boyd's cousin, was sitting on the front porch of their grandmother's house after attending a party that was hosted by their uncle. Boyd approached the house, asked Holt if she had seen all the police cars in the neighborhood, and stated that he had a warrant out for his arrest and needed to leave the area. Boyd then went inside the house. Holt had not seen any police cars up to that point but saw multiple officers patrolling the neighborhood just after Boyd arrived at the house.

After being notified about Farmer's shooting, the South Bend Police Department began searching for the scene of the shooting but were unsuccessful. The next morning, Officer Ken Ryan located a car parked oddly in an alley. He noticed that the driver's side window was shattered and had a bullet hold through the safety glass. Inside the car, he found a second victim, Mercedes Newbill; Newbill and Boyd were also cousins. Newbill was dead with a gunshot wound to his head. Newbill and Farmer had been together the night of the shooting.

Crime-scene technicians were called to the scene to process the car.

Crime scene technicians arrived at the scene and took pictures of Newbill and the car, and searched for fingerprints and DNA evidence. . . . The technicians noticed that the driver's side window was shattered, and it was evident that the source of the shot was inside the car. The technicians were unable to find any shell casings at the scene, which led them to believe they might be looking for a revolver as the murder weapon. They were able to find a bullet lodged in the driver's side door that was fired from the rear passenger seat, and had narrowly missed Newbill's chest before going through the armrest of the door and getting stuck inside. Another shot passed through the front passenger seat belt. Based upon Farmer's injuries, the technicians believed that one of the wounds to Farmer's lower back could have occurred as a result of being shot while exiting the car. The wound to Farmer's upper back likely did not occur inside the car, but after Farmer had already exited the car.

Crime scene experts were successful in lifting twenty-two latent prints from the exterior of the car on the side where the murders took place. Out of those prints, some were matched to three individuals. Newbill's fingerprints were found around the outside of the driver's side door, and Rashondra Blake's fingerprints were found

just under the window of the front passenger side door. Rashondra Blake is [Michele] Brown's sister. The third set of prints belonged to Boyd and those fingerprints were found exclusively on the outside of the rear passenger side door. Investigators determined that the shooter was sitting in the rear passenger seat. *Id.* at 5-6 (emphasis added).

One month later, Boyd was arrested on an unrelated charge, and police questioned him about the murders. He told officers that on the night of the murders he was at his uncle's party and when he left the party he went to his grandmother's house where he ran into Holt. Boyd claimed that he had not seen Newbill in weeks. Boyd also denied ever seeing, let alone being near, the car where Newbill died, despite being shown fingerprint evidence placing him at the car.

Before Boyd was charged with the murders of Farmer and Newbill, Jermon Gavin approached detectives with information about Boyd.

> Gavin described his relationship with Boyd as very close, "like brothers." [Trial] Tr. at 228. Gavin stated that while he and Boyd shared the same pod, or section, of the jail, Boyd had made some statements about the murder of Newbill and Farmer. Gavin indicated that Boyd seemed very cocky about the murders and told him that other people did not understand what it was "like to wake up every day with a body" on their conscience. *Id.* at 231. Gavin further provided officers with details about Boyd's police interrogation including the fact that they had served him Barnaby's pizza during the interrogation, an uncommon occurrence known only by Boyd and the officers.
>
> Gavin also told the officers that Boyd believed Newbill had been shot in the head and the chest, and that five shots had been fired. Although police officers had released information that Newbill had been shot in the head, none of the other information, such as that a gunshot had appeared to have been fired in the direction of Newbill's chest, was released to the public. Because Gavin was in jail at the time of the murders, he could not have been suspected of committing the murder.
>
> Boyd admitted to Gavin that he, Newbill, and Farmer planned to commit a robbery that evening at a house on Laurel Street and Jefferson Boulevard. Farmer had brought along his .38 special revolver, and gave it to Boyd before they went to case the house they intended to rob. They parked the car down the road on Laurel Street, but returned to the car after casing the house. On the way back to the car and out of Farmer's earshot, Boyd and Newbill argued about whether Boyd could just take the gun from Farmer. Newbill told Boyd that if he were to "get into it" with Farmer, Boyd would have a problem with Newbill, too. [*Id.*] at 232.
>
> When the three men returned to the car, Newbill was in the driver's seat,

> Farmer was in the front passenger seat, and Boyd was in the rear passenger seat behind Farmer. An argument ensued after which Newbill grabbed the "do-rag" off of Boyd's head. [*Id.*] at 233. Boyd shot Newbill in the head and fired another shot toward Newbill's chest. Newbill died almost immediately as a result of the gunshot wound to his head. Farmer got out of the car and attempted to escape. Boyd shot Farmer three times until the gun clicked. Farmer then fell to the ground, but did not immediately die from his injuries. Boyd then ran back to his house stating that the police were "everywhere." [*Id.*] at 234. Boyd then told Gavin that he sold the gun to Javon Thomas ("Thomas").

*Id.* at 6-8. Boyd was charged with two counts of murder.

During Boyd's jury trial, the State called Gavin to testify. Gavin's testimony was similar to the statement he had given police before the trial. An officer confirmed that Boyd was given Barnaby's pizza during his interview and that this was the only investigation where that had occurred. Thomas also testified that he bought a revolver from Boyd a few days after May 5. Thomas stated that after he was arrested he told his mother to get rid of the gun. The gun was later found in Robert James's possession during a routine traffic stop.

During Gavin's testimony, the State introduced a letter from the deputy prosecutor to Gavin's attorney regarding the terms of Gavin's plea deal in exchange for his truthful testimony against Boyd. The letter included the following statement: "Investigators and I have found Mr. Gavin's statement to be accurate and trustworthy." Ex. 40. Defense counsel objected to the admission of the letter, arguing that the statement was vouching, but the objection was overruled. Defense counsel did not request that the statement be redacted, and the full letter was published to the jury.

Holt also testified on behalf of the State. She said that Boyd approached her grandmother's house from the opposite direction of her uncle's party—the direction where Newbill and Farmer were shot. Months earlier, police had questioned Holt about the night of the murders. At that time, Holt told officers that she did not remember what direction Boyd approached the house. Defense counsel did not question Holt about her prior inconsistent statement. Rather, counsel reemphasized her direct-examination testimony that she did not go inside at her uncle's party (implying that she did not know if Boyd was at the party) and that she could not remember what time Boyd arrived at her grandmother's house.

The jury found Boyd guilty of both murders. Boyd, represented by his trial attorney, filed a direct appeal challenging the sufficiency of the evidence against him. This Court found that there was sufficient evidence to support the convictions. *See Boyd*, No. 71A04-1304-CR-174. Boyd then filed a petition for post-conviction relief, arguing that his attorney was ineffective for failing to impeach Holt, for failing to request that the language vouching for Gavin's truthfulness be redacted from the

letter, and for failing to raise the vouching issue on direct appeal.

Boyd's attorney testified at the fact-finding hearing that he remembered Holt being very unsure of her answers. "What I recall about her testimony is something that may not be reflected in the black and white transcript. What I recall about her testimony is that she was very hesitant about a lot of her answers. She went back and forth." P-C Tr. p. 11. He went on to say, "A lot of times I get people who change their stories, can't remember things. You know, I have to make a judgment call when I see the person actually testify in court as to whether or not they're a believable witness[.]" *Id.* at 12.

Regarding the deputy prosecutor's letter that vouched for Gavin, the attorney stated that he could not remember why he did not ask for the vouching statement to be redacted. The attorney admitted that he could have raised both the sufficiency and vouching claims on direct appeal, but he chose to raise only the sufficiency argument because he "didn't think [vouching] was a very good issue." *Id.* The post-conviction court denied Boyd's petition.

*Boyd v. State*, 91 N.E.3d 1104, 2017 WL 4274089, *1-4 (Ind. Ct. App. 2017) (footnote omitted) ("*Boyd II*").

In the end, the Indiana Court of Appeals in *Boyd II* agreed with Mr. Boyd that his counsel provided deficient performance in three respects, but it concluded that Mr. Boyd was not prejudiced by counsel's mistakes. *See id.* at *7. The Indiana Supreme Court denied transfer. *See Boyd v. State*, 95 N.E.3d 76 (Ind. 2017).

Mr. Boyd filed the instant petition for a writ of habeas corpus on January 5, 2018.

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation

marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded

jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III.
### Discussion

Mr. Boyd argues that his trial and appellate counsel provided ineffective assistance. First, he argues that trial counsel's performance was deficient because he failed to impeach Ms. Holt's testimony that she did not know from which direction Mr. Boyd approached on the night of the murder, and he failed to request redactions of the statements in the prosecutor's letter vouching for Mr. Gavin's credibility. Second, Mr. Boyd argues that appellate counsel should have raised the improper vouching issue on direct appeal. After briefly setting forth the standards governing ineffective-assistance-of-counsel claims, the Court will address each of Mr. Boyd's claims in turn.

A criminal defendant has a right under the Sixth Amendment to effective assistance of trial and appellate counsel. *See Strickland*, 466 U.S. at 687. For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* "The prejudice prong

requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Laux v. Zatecky*, 890 F.3d 666, 673-74 (7th Cir. 2018) (quoting *Strickland*, 466 U.S. at 694).

### A. Ineffective Assistance of Trial Counsel

The Indiana Court of Appeals concluded that trial counsel should have impeached Ms. Holt with her prior inconsistent statement. It explained this conclusion, in relevant part, as follows:

> One month after the murders, Holt was questioned by police and told officers that she did not remember the direction from which Boyd had approached her grandmother's house on the night of May 5. At trial, when questioned by the State, Holt testified that Boyd approached the house from the opposite direction of her uncle's party—in other words, Boyd approached the house from the direction where Farmer and Newbill were shot. On cross-examination, Boyd's attorney did not confront Holt with the earlier statement she had given to police.
>
> . . . .
>
> We disagree with the post-conviction court and find that the decision to let Holt's answers stand as is because she was not coming across as credible was not a reasonable trial strategy in this case. Boyd's attorney failed to state a strategic reason for the failure, the State has not suggested one, and we cannot think of one. Pointing out that Holt's story had changed over time would have further established her lack of credibility.

*Boyd II*, 2017 WL 4274089, at *5.

The Indiana Court of Appeals also concluded that trial counsel should have sought to redact the vouching statements regarding Mr. Gavin in the prosecutor's letter, reasoning as follows:

> The challenged statement [in the prosecutor's letter] reads, "Investigators and I have found Mr. Gavin's statement to be accurate and trustworthy." Ex. 40.
>
> . . . .
>
> We disagree with the [post-conviction] court's conclusion that this was a reasonable tactical decision. Boyd's attorney recognized the vouching language contained in the letter because he objected to the letter's admission. However, after being overruled, he failed to request that the vouching statement be redacted, and during the post-conviction hearing he was unable to articulate any strategic reason for this failure.

*Boyd II*, 2017 WL 4274089, at *6.

The Indiana Court of Appeals concluded, however, that trial counsel's errors did not prejudice Mr. Boyd. In reaching this conclusion, the Indiana Court of Appeals focused on three aspects of the evidence against Mr. Boyd. First, it noted that there was strong physical evidence connecting Mr. Boyd to the murders: "The jury was presented with physical evidence—Boyd's fingerprints that were found on the outside of the rear passenger door of the car where Newbill's body was found. Crime-scene investigators determined that the shooter was sitting in the rear passenger seat." *Id.* at 7.

Second, the Indiana Court of Appeals detailed evidence showing that Mr. Boyd knew where Mr. Newbill had been shot even though that information was not made public:

> [T]he jury heard Boyd tell officers that Newbill was shot in the head and chest. "Somebody else said [Newbill] tried to commit suicide, but I said, 'How can you commit suicide if you get shot in the chest and the head?'" Ex. 35 at 43:22. Officers asked Boyd to clarify where Newbill had been shot, and Boyd again stated that Newbill was shot in the chest and the head. When asked how Boyd knew Newbill was shot in the chest, Boyd stated that a family member was told by an investigator where Newbill had been shot and that the family member had then told Boyd the information. The officers responded, "We don't release where they're shot." *Id.* at 44:17. Officers never publicly released any information about the shot aimed at Newbill's chest.

*Boyd II*, 2017 WL 4274089, at *7.

Third, regarding the impermissible vouching of Mr. Gavin's credibility, the Indiana Court of Appeals reasoned that the jury would have deemed Mr. Gavin's testimony credible even without it:

> [E]ven without the letter, the jury was inclined to believe Gavin because of multiple instances that bolstered his credibility. Gavin testified that, while housed in the same area of the jail, Boyd confessed to him about the murders and provided details about the murders that only the shooter would have known—two shots were fired at Newbill, one at his head and one at his chest. Gavin also stated that Boyd used a .38 revolver that was later sold to Thomas. Thomas corroborated this statement,

> telling the court that a few days after May 5 he bought a revolver from Boyd. Other details that Gavin provided officers related to the conditions under which Boyd was interviewed—officers gave Boyd Barnaby's pizza and soda. These details bolstered Gavin's credibility because it was the first time that officers had ever given Barnaby's pizza to someone in an interview room. *See* Trial Tr. p. 299.

*Boyd II*, 2017 WL 4274089, at *7 (footnote omitted).

The foregoing analysis is a reasonable application of *Strickland*'s prejudice standard. As the Indiana Court of Appeals implicitly recognized, the prejudice analysis requires a court to consider the strength of the evidence against the defendant. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The Indiana Court of Appeals concluded that the evidence against Mr. Boyd was strong. It explained that the physical evidence from the crime scene—Mr. Boyd's fingerprints were on the car door of the rear passenger seat, which was where the shooter sat—strongly suggested that Mr. Boyd was the shooter. Notably, Mr. Boyd denied ever being near the car, even though his fingerprints were on the rear passenger door. Moreover, the Indiana Court of Appeals detailed the evidence showing that Mr. Boyd knew information about the shooting that was not public, which strongly suggests that Mr. Boyd was involved. It is reasonable to consider these as strong indicators of Mr. Boyd's guilt, and to thus conclude that the prejudice flowing from trial counsel's errors would have to be significant in order for there to be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Indiana Court of Appeals explained why the prejudice flowing from trial counsel's errors was insufficient. Regarding the impermissible vouching, the Indiana Court of Appeals correctly explained that the jury would have deemed Mr. Gavin's testimony credible even without the impermissible vouching. For example, Mr. Gavin testified that Mr. Boyd stated he shot Mr.

Newbill in the head and chest. Trial Tr. at 233. But where Mr. Newbill was shot was not public information. *See Boyd II*, 2017 WL 4274089, at *7. And Mr. Gavin was in jail when the murder occurred, so his knowledge could not have come through personal involvement in the crime. Trial Tr. at 299-300. Mr. Gavin also knew that the police officers questioning Mr. Boyd gave him Barnaby's pizza and soda, and this was the first time they had given anyone food from Barnaby's. Trial Tr. at 299. Based on this evidence, even without the impermissible vouching, it is reasonable to conclude that the jury would have credited Mr. Gavin's testimony.

Lastly, although not discussed by the Indiana Court of Appeals, the prejudicial effect of trial counsel's failure to impeach Ms. Holt was not overwhelming. Proper impeachment would have suggested that Ms. Holt did not remember whether Mr. Boyd approached from the direction of the crime on the night of the murder. But it would not have provided evidence that Mr. Boyd came from his uncle's party (which was the opposite direction of the crime). While trial counsel should have impeached Ms. Holt with her prior statement to the police, the error's prejudicial impact was low because the proposed impeachment would not have provided affirmative evidence of innocence.

In the end, this Court need not decide whether it ultimately agrees with the Indiana Court of Appeals's prejudice analysis. The Court must "review[] the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When, as here, state courts apply the general principles of *Strickland*, they have "more leeway . . . in reaching outcomes in case-by-case determinations." *Schmidt*, 911 F.3d at 477 (citation and quotation marks omitted). Given this leeway, the Court cannot say that the Indiana Court of Appeals's decision was unreasonable. It evaluated the collective prejudice from trial counsel's errors and, given the strength of the other evidence presented at trial, concluded that

*Strickland*'s prejudice standard was not met. This decision was not "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dassey*, 877 F.3d at 302 (quoting *Richter*, 562 U.S. at 103). Accordingly, Mr. Boyd is not entitled to habeas relief on his ineffective-assistance-of-trial-counsel claim.

### B. Ineffective Assistance of Appellate Counsel

Mr. Boyd argues that his appellate counsel (who was the same as his trial counsel) provided ineffective assistance by failing to raise the impermissible vouching claim on direct appeal even though he preserved it by objecting during trial. Much like the Indiana Court of Appeals did for Mr. Boyd's ineffective-assistance-of-trial counsel claim, it concluded that appellate counsel was deficient for failing to raise the vouching issue on direct appeal. It reasoned as follows:

> Boyd contends that the vouching claim had a reasonable probability of succeeding on appeal whereas his insufficient-evidence argument did not. . . . We conclude that Boyd's attorney's performance was deficient. The attorney properly preserved the admission of the letter for appeal, and this was a significant and obvious issue to raise on appeal. When asked why he did not raise the issue on direct appeal, the attorney simply stated that he "didn't think it was a very good issue." P-C Tr. p. 14. While we give considerable deference to appellate counsel's decision regarding which arguments to raise, this answer does not persuade us that the decision was strategic.

*Boyd II*, 2017 WL 4274089, at *6.

The Indiana Court of Appeals, however, concluded that Mr. Boyd was not prejudiced by this failure for the same reasons he was not prejudice by trial counsel's errors. *See id.* at *7. This is a reasonable application of *Strickland*'s prejudice analysis. Simply put, if Mr. Boyd was not prejudiced by trial counsel's failure to impeach Ms. Holt and failure to redact the vouching statements, his conviction would not have been reversed on direct appeal on the vouching issue alone. He is therefore not entitled to habeas relief on this claim either.

## IV.
## Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Indiana Court of Appeals's conclusion that Mr. Boyd was not prejudiced by his counsel's mistakes was reasonable, and thus no reasonable jurist could disagree with the foregoing resolution of his ineffective-assistance-of-counsel claims. Therefore, a certificate of appealability is **denied**.

## V.
## Conclusion

Mr. Boyd's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied**, and a certificate of appealability shall not issue.

Final Judgment in accordance with this decision shall issue.

**IT IS SO ORDERED.**

Date: 6/5/2019

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Distribution:

DABIAN BOYD
211171
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Andrew A. Kobe
INDIANA ATTORNEY GENERAL
andrew.kobe@atg.in.gov